IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN S. BURKE,

    Petitioner,               No. CIV-S-06-0569 GEB KJM P

  vs.

BEN CURRY, et al.,

    Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a California prisoner proceeding pro se with an application for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner stands convicted of several offenses, including attempted murder. He challenges his 2003 convictions and the life sentence that followed.

I. <u>Background</u>

        On direct appeal, the California Court of Appeal properly identified the "relevant facts" as follow:

> After dinner with his wife on June 27, 2001, Steven Beck went to the Miner's Club to play pool. He met defendant there, and the two played pool together. Initially, defendant was "nice," but he became less friendly as he lost more pool matches.
>
> At one point, Beck and defendant became partners in a game of "doubles" pool with two other patrons of the bar. During the course of the game, defendant made a "slop shot," an unplanned shot in which an unintended ball goes into a pocket. When Beck

said to the other team that they could "go ahead and play slop, too," defendant told Beck to "shut up and . . . stop talking" and called Beck a "little scrawny punk." Then defendant started "getting in [Beck's] face, becoming abusive, telling him, . . . you're not going to talk to me that way . . . ." For 15 to 20 minutes, defendant yelled at Beck, repeatedly threatening to take him outside to "teach [him] a lesson and beat [his] ass." Defendant continued to get more aggressive and threatening, until he was "nose to nose" with Beck. Thinking that defendant was "about ready to hit [him]," Beck kicked defendant "as hard as [he] could right between the legs." They then began circling each other, and Beck punched defendant twice and kicked him again in the groin.

When he thought defendant was raising the pool cue to hit him, Beck grabbed the cue and broke it over defendant's head, opening a cut that bled extensively.

Defendant continued to advance so Beck pushed a stool at him and ran out the front of the bar. Defendant followed and yelled at Beck, "I can't believe you're picking on an old guy." Telling defendant to stay away, Beck returned to the bar to retrieve his sweatshirt.

Feeling he would be safer at the restaurant where he had eaten dinner earlier, Beck went there. But the restaurant was closing, so he decided to go to a nearby hotel. As Beck was crossing the street in front of a fire station, he stopped near the yellow lines in the middle of the roadway. The next thing Beck remembered is that someone was telling him he had been hit by a car.

Joanna Gagliardo, the bartender at the Miner's Club, testified that during the evening, she served defendant two or three shots of Jack Daniels, and Beck had two or three beers. Gagliardo observed defendant and Beck argue and taunt each other, and then get into a "physical" fight. She also heard defendant tell Beck to "watch his back." Although she did not remember it at trial, Gagliardo told Deputy Sheriff Steve Klang on the night of the incident that defendant was the aggressor in the fight.

Throughout defendant's altercation with Beck, the other pool players heard defendant repeatedly say he was "drunk" on whiskey and heard him warn Beck that it was not smart to pick a fight with someone who was drunk. One of the other pool players believed that defendant was more intoxicated than Beck, but noted defendant was able to play pool very well.

John Johnson, who had been at the Miner's Club, testified that he was getting into his vehicle when defendant ran by, said "I'm going to kill that motherfucker," and jumped into defendant's pickup truck. Defendant then sped away and circled back toward Main Street. Johnson heard the engine racing and saw the truck veer into

the parking barriers in the middle of the road, continue to accelerate, and hit Beck. The truck proceeded down the road out of town without stopping or slowing. Jacob Robinson and Chase Mason also saw defendant get into his pickup truck. Mason noticed that defendant was bleeding and heard him talking to himself about being hit in the head with a pool cue and "something about being drunk and stuff." To Mason, defendant appeared drunk and confused. Mason and Robinson observed the truck circle back and accelerate toward Beck, who was standing in the middle of the road. The truck hit Beck and sped away.

Virginia Asbury, the owner of the hotel, saw Beck bounce off the driver's side fender of a pickup truck, which continued on without slowing.

Beck lost consciousness and awoke in the emergency room. As a result of being hit by defendant's truck, Beck suffered fractures to his second, third, fourth, and fifth lumbar vertebrae; a laceration to the spleen; a concussion and extensive abrasions along the right side of his abdominal wall and chest; and abrasions of the right arm, elbow, and both knees. He spent the day in the hospital, had trouble walking for a "long time," and was unable to work for three months.

After determining defendant was a suspect in the hit and run, Deputy Sheriffs Klang and Wilkes went to defendant's home later that night. Defendant appeared dejected and his head was bleeding. They took him to the hospital, where it was determined that in addition to his head wound, defendant "had numerous significant bruises all over the body. [He] was impressively beat up." A CAT scan revealed a dent in the top of his skull, but no skull fracture. A blood sample drawn at 1:40 a.m. showed that defendant had a blood alcohol concentration of .076 percent. The treating physician did not observe signs of psychiatric disease in defendant but believed the head trauma had been "a significant contributing factor to his behavior that night."

While at the hospital, defendant told Deputy Klang that when Beck criticized defendant's pool playing, the two began to argue, which escalated into a fight. Defendant claimed that he did not remember much after Beck hit him over the head with a pool cue. However, defendant did recall that after he left the bar, a young man helped him to his truck and was driving it when "the next thing [defendant] knew, . . . they were running over Mr. Beck and . . . he couldn't understand why it happened, other than the fact that the [young man] may have witnessed the beating that Mr. Beck gave [defendant] and maybe that's why he hit him." Defendant said the young man drove to the corner, "jumped out of the truck and took off." Defendant then drove himself home. During this interview, defendant appeared articulate and did not seem confused.

About one month later, Detective Hoagland went to defendant's home to serve a search warrant and to seize defendant's truck. Defendant approached Hoagland and said he had lied to the deputies because he thought he had hit someone named "Martha," and believed he had killed her. Defendant again described the bar fight and stated he had wanted to get medical attention at the fire station but was afraid that Beck or Beck's friends would harm him again. Thus, he accelerated in front of the fire station, intending to skid to a stop on the street and run into the station. Because he turned his head toward the Miner's Club to see if Beck and his friends were there, defendant did not see Beck in the roadway. Defendant believed that the person he had hit would get quick medical attention, so he decided "just to leave." Defendant also said he believed that the front end of his truck was defective, which might have contributed to hitting Beck. When Hoagland test drove the truck, he did not find any defects that would have contributed to the accident.

Psychiatrist Charles Eubanks examined defendant approximately four months after the bar fight. According to Eubanks, defendant sought him out because defendant "could no longer tolerate" the voices in his head. Eubanks saw defendant about 25 times. Based on the therapy sessions and his review of defendant's history of psychiatric diagnoses and treatment at El Dorado County Mental Health [footnote omitted], Eubanks concluded that defendant suffered from schizophrenia, paranoid type. He described the most prominent feature of defendant's dysfunction to be auditory hallucinations, consisting of "several different voices carrying on conversations with each other, inserting thoughts in his head, making comments about him, critiquing his behavior." Defendant reported that he had been having these hallucinations since his late teens.

Dr. Eubanks noted that schizophrenia impairs one's ability to think logically, to plan an event, to know what are facts as opposed to delusions or hallucinations, and to "connect a series of rational thoughts with a purpose in mind." Eubanks believed that defendant's disease had led to his reactions at the bar and contributed to the fight. He bolstered this opinion by referring to various specific events that evening. Eubanks noted that defendant could not "coherently [or] logically" explain why he went to the bar in the first place, that his comments to Beck once the argument started were irrational, and that his reluctance to seek medical attention at the fire station was a reflection of his paranoia. Eubanks also noted that schizophrenics generally are ordered not to consume alcohol or other mind altering drugs.

Dr. Eubanks acknowledged that schizophrenics typically are unable to maintain employment and sustain relationships, but that defendant had worked continuously from his high school graduation until October 2001, and had been married for over 25

4

years. Eubanks also acknowledged that it was possible defendant's mental disease had nothing to do with his behavior on June 27, 2001.

Two of defendant's long-time friends testified that they had observed him behaving strangely prior to the bar fight, including talking to trees, believing that the television was sending him messages, believing that he was the "prodigal son of God," reporting that he was sent on secret missions in various countries, crying out to nobody, and saying that demons were after him.

Resp'ts' Lodged Doc. #5 (Op.) at 2-8.

II. Standard For Habeas Corpus Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[1] It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

/////

/////

/////

---

[1] Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief. Fry v. Pliler, 551 U.S. 112, 127 S. Ct. 2321, 2326-27 (2007).

5

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

"Clearly established" federal law is that determined by the Supreme Court. Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004). At the same time, it is appropriate to look to lower federal court decisions as persuasive authority in determining what law has been

"clearly established" and the reasonableness of a particular application of that law. Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court precedent is misplaced.

III. Arguments And Analysis

    A. Right to Present a Defense (Opinion Of Dr. Eubanks)

Petitioner claims the trial court violated his Constitutional right to present a defense by excluding from evidence Dr. Eubanks' opinion that petitioner did not have a premeditated intent to kill Steven Beck when petitioner ran Beck over with his truck. Pet. at 4.[2] In his traverse, petitioner suggests Dr. Eubanks' testimony was essential to his "sole defense" of lack of mens rea. Traverse at 12-13. The claim was presented on direct appeal; the California Court of Appeal was the only court to issue a reasoned opinion with respect to the claim.

On direct review, the Court of Appeal pointed to California law that precludes evidence from medical experts in the form of an opinion as to whether the defendant had the intent required to commit the crime charged. Op. at 9. Under California law, only the trier of fact can decide whether the defendant possessed the requisite intent. See Cal. Penal Code § 29. The Court of Appeal found that these provisions of California law do not violate a defendant's Constitutional right to present a defense:

> . . . [California Penal Code] [s]ections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present.
>
> . . . [D]efendant was not prevented from presenting evidence of his mental illness. Nor was he prevented from presenting evidence that an element of the offense was missing as a result of his mental

---

[2] Pagination is according to the court's CM/ECF system.

7

> illness. He was prevented only from having his expert testify that he did not in fact premeditate the attempted murder.

Op. at 9 (citations omitted).

In general, a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional right or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

The Supreme Court has explored a criminal defendant's right to present a defense in a cluster of cases. In Washington v. Texas, 388 U.S. 14 (1967), the Court struck down a Texas statute that forbade a defendant from calling a co-perpetrator as a witness, saying the defendant's right to compulsory process was violated when the state enforced its procedure to prevent defendant from presenting a witness with relevant and material testimony. Id. at 22-23. In Chambers v. Mississippi, 410 U.S. 284 (1973), the Court reversed Chambers' conviction because the trial court excluded, as hearsay, testimony from several witnesses prepared to testify that a man named McDonald had confessed to the murder with which Chambers was charged. The Court found the state had applied its hearsay rule "mechanistically to defeat the ends of justice" when it rejected the proffered evidence, which "bore persuasive assurances of trustworthiness" and was "critical to Chambers' defense." Id. at 302.

More recently, in Rock v. Arkansas, 483 U.S. 44 (1987), the Court considered a ruling permitting the defendant to testify about killing her husband, but not to describe what she had remembered during hypnosis. In remanding the case, the Court recognized that a state could not enforce a rule that "arbitrarily excludes material portions of [a witness's] testimony" but recognized "the right to present relevant testimony is not without limitation." Id. at 55-56. In United States v. Scheffer, 523 U.S. 303 (1998), the Court considered Military Rule of Evidence 707, which made polygraph evidence inadmissible in court-martial proceedings. As it had in

Rock, the Court examined the accommodation between a defendant's right to present a defense and the government's interests in ensuring reliable evidence is presented and avoiding litigation collateral to the purpose of the trial. Id. at 308-09. It observed that rules excluding evidence "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." Id. at 308 (internal quotations omitted).[3]

> traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence. . . . [T]he Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive . . ., only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues.

Crane v. Kentucky, 476 U.S. 683, 689-90 (1986) (internal quotations omitted).

Finally the court recognizes that Federal Rule of Evidence 704(b), which is similar to the California statutes referenced by the California Court of Appeal, has never been invalidated by the U.S. Supreme Court. See United States v. Morales, 108 F.3d 1031, 1038 (9th Cir. 1997).

Dr. Eubanks was allowed to testify as to petitioner's condition. He was only prevented from rendering an opinion on the legal consequences of that condition. In light of the

---

[3] After petitioner's conviction became final in 2005, the Court again examined a defendant's right to present a defense, in Holmes v. South Carolina, 547 U.S. 319 (2006). In that case, the South Carolina court had excluded evidence that another person had committed the murder with which Holmes was charged because the strength of the prosecution's forensic evidence meant, in its view, that the proffered third party culpability evidence did not raise a reasonable inference as to Holmes' innocence. The Court acknowledged that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id. at 326. The Court ultimately found the trial court erred in relying only on the prosecution's evidence to gauge the relevance of the proffered defense testimony. Id. at 329-31.

relevant Supreme Court authority cited above, or lack thereof, the court finds that petitioner's claim concerning the testimony of Dr. Eubanks is barred by 28 U.S.C. § 2254(d) because the ruling of the California Court of Appeal regarding petitioner's claim is not contrary to, nor did it involve an unreasonable application of Supreme Court precedent.  Petitioner's first claim must be rejected.

### B. Limitation Of Reference To Intoxication

Petitioner titles his second claim as one that challenges the trial court's refusal to allow petitioner's arguments based on his intoxication as a violation of his Fourteenth Amendment due process rights or Sixth Amendment right to compulsory process.  Pet. at 4.  He goes on to describe the claim as follows:

> Petitioner contends the trial court's fallacious ruling to exclude evidence that petitioner's blood alcohol level, as measured several hours after the events in Georgetown was .071, correlative with his mental illness i.e., paranoid schizophrenia and head injuries precluded him from forming intrinsic elements of the charged crimes . . .

Id. at 5.  Petitioner's claim as presented is difficult to interpret.  Although it appears he is objecting to the exclusion of evidence, it is not clear what evidence was excluded.  Information on petitioner's blood alcohol level itself was admitted.  RT 287.  To the extent petitioner objects to the exclusion of some of Dr. Eubanks' testimony and petitioner has exhausted state court remedies with respect to his objection, the objection is addressed in the discussion of petitioner's first claim.

On direct appeal, petitioner asserted a claim that appears related to his second claim as presented here; the claim there concerned the trial court's decision precluding petitioner's attorney's argument in closing that petitioner was "under the influence of alcohol" at the time the crimes at issue were committed.  Because petitioner has exhausted state court remedies with respect to that claim and the claim is not duplicative of petitioner's first claim, the

/////

court assumes for purposes of these findings that petitioner is making the same claim before this court. The Court of Appeal addressed the claim as follows:

> Defendant's claim of error rests on the premise that defense counsel was precluded from arguing that defendant's intoxication prevented him from forming the requisite mental state. Not so. He simply was precluded from using the term "under the influence." In sustaining the objection, the trial court specifically noted that this phrase is a "term of art," but that counsel "can say [defendant] was affected by the alcohol, probably."
>
> In any event, we perceive no prejudice to defendant. Evidence was presented on the amount of alcohol that defendant consumed on the night of the crime, his intoxicated appearance at the time of the fight, his blood alcohol level several hours after the fight, and the fact that persons with his mental condition are advised not to drink alcohol. And the jury was properly instructed regarding voluntary intoxication (CALJIC Nos. 4.21.1 and 4.22), including that, although voluntary intoxication is not a defense to the crime of attempted murder or attempted manslaughter, if the evidence showed that defendant was intoxicated, the jurors "should consider that fact in deciding whether or not [he] had the specific required mental intent."

Op. at 11.

To the extent petitioner raises the same claim here that he raised before the Court of Appeal, the court finds no grounds for relief. As indicated by the Court of Appeal, the trial court's prohibiting counsel from saying petitioner was "under the influence" did not prevent petitioner from presenting the substance of this aspect of his defense in any other meaningful way. See RT 519-520. The court will recommend that petitioner's second claim be rejected.

    C. <u>Ineffective Assistance Of Trial Counsel</u>

Petitioner claims his trial counsel rendered ineffective of counsel in violation of the Sixth Amendment by: 1) failing to inform petitioner that he could face life in prison if he proceeded to trial without accepting a sentence of seventeen years in exchange for a plea of guilty; and 2) failing to interview potential defense witnesses. Pet. at 5-6.

The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims arising under the Sixth Amendment. See <u>Strickland v. Washington</u>, 466 U.S.

668 (1984).  First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Id. at 688.  To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  Second, a defendant must affirmatively prove prejudice.  Id. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

With respect to petitioner's first ineffective assistance claim, the record indicates petitioner was advised of the maximum sentences for the crimes charged at his arraignment. CT 20, 22.  Therefore, petitioner cannot show prejudice from any failure by his counsel to inform petitioner he could be subjected to life imprisonment if he elected to go to trial.  Cf. Travasso v. Clark, 162 F. Supp. 2d. 1106, 1116-17 (N.D. Cal. 2001) (trial counsel not ineffective for misadvising defendant as to maximum sentence under plea agreement where trial court provided correct information).

With respect to his claim that counsel should have interviewed potential witnesses, petitioner also fails to establish prejudice because he fails to provide any information as to how those witnesses would have testified and altered the outcome at trial.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (prejudice not established where petitioner failed to identify specific evidence counsel should have presented).  For these reasons, petitioner's ineffective assistance of counsel claims must be rejected.[4]

---

[4] In his traverse petitioner embeds a request for an evidentiary hearing on his ineffective assistance of counsel claims.  Traverse at 15-16.  A habeas petitioner is entitled to an evidentiary hearing on a claim only "if he alleges facts that, if proven, would entitle him to relief."  Turner v. Calderon, 281 F.3d 851, 890 (9th Cir. 2002).  Petitioner fails to point to facts that are not already before the court that could result in his being granted habeas relief.  Therefore, an evidentiary hearing is not warranted.

    D.  Ineffective Assistance Of Appellate Counsel

Finally, petitioner asserts counsel on direct appeal was ineffective for failing to raise the reference to intoxication claim identified above. Pet. at 6. In order to show ineffective assistance of appellate counsel, petitioner must show that counsel was objectively unreasonable in failing to raise non-frivolous issues and that, but for counsel's failure, there is a reasonable probability petitioner would have prevailed on appeal. Smith v. Robbins, 528 U.S. 259, 285-86 (2000). As indicated above, petitioner has not shown any probability of success on any aspect of his reference to intoxication claim. Therefore, his ineffective assistance of appellate counsel claim must be rejected.

IV.  Conclusion

For the foregoing reasons, the court will recommend that petitioner's application for writ of habeas corpus be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 10, 2009.

U.S. MAGISTRATE JUDGE

1/burk0569.157(a)